695 S.E.2d 901

### LAWYER DISCIPLINARY BOARD, Petitioner,

v.

### G. Patrick STANTON, Jr., a member of The West Virginia State Bar, Respondent.

### No. 34257.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 12, 2010.

Decided June 10, 2010.

Rachael L. Fletcher Cipoletti, Esq., Chief Lawyer Disciplinary Counsel, Charleston, WV.

Gregory H. Schillace, Esq., Clarksburg, WV, for G. Patrick Stanton Jr.

PER CURIAM:

This legal disciplinary matter arises from the recommended decision of the Hearing Panel Subcommittee (hereinafter referred to as "Panel") of the Lawyer Disciplinary Board (hereinafter referred to as "Board") for violations of the West Virginia Rules of Professional Conduct (hereinafter referred to as "Rules"). The respondent, G. Patrick Stanton, Jr., was charged with violating Rule

8.4(c) and Rule 8.4(d) of the West Virginia Rules of Professional Conduct for an incident involving the use of misrepresentation and dishonesty to gain access to a prisoner incarcerated at Pruntytown Correctional Center. Following a hearing on December 12, 2008, the Board determined that the respondent's conduct violated Rule 8.4(c) and Rule 8.4(d) of the Rules. The Board recommended to this Court that the respondent be admonished for his conduct; that the respondent complete six hours of continuing legal education (CLE) in the area of ethics during the 2008–2010 reporting period, in addition to what he is otherwise required to complete to maintain his active license to practice; and that the respondent pay the costs of these proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

The respondent agreed to the imposition of sanctions recommended by the Board. The Office of Disciplinary Counsel recommended that the respondent's law license be suspended for one year; that he complete six hours of continuing legal education in the area of ethics in addition to those hours already required to maintain an active license; and that he reimburse the Board for the costs of these proceedings. For the reasons discussed below, we accept the Panel's recommendations and conclusions of law, but reject the Board's recommended sanctions, and instead, annul the respondent's license to practice law as well as require the respondent to reimburse the Board for the costs of these proceedings.

# I.

## PROCEDURAL AND FACTUAL BACKGROUND

On July 14, 2008, the Investigative Panel of the Lawyer Disciplinary Board (hereinafter referred to as "Board") charged the respondent, G. Patrick Stanton, Jr., with violation of Rules 8.4(c) and 8.4(d) of the West Virginia Rules of Professional Conduct.[1] The respondent was admitted to the West Virgi-

nia State Bar in 1979. From 1979 to 2005 the respondent practiced law in Marion County, West Virginia.

The Statement of Charges alleged that on October 11, 2005, the respondent traveled to Pruntytown Correctional Center (hereinafter referred to as PCC) in Grafton, Taylor County, West Virginia, to meet with inmate Rose Auvil. Ms. Auvil was serving a prison sentence arising from her convictions in Taylor and Marion County on unspecified charges.

The respondent previously represented Ms. Auvil in various civil and criminal matters, with and without compensation, beginning in 1992 until his last representation of her in 2003. This last representation of Ms. Auvil involved criminal charges. In 2004, the respondent was employed as an assistant prosecuting attorney in Marion County and was therefore unable to represent criminal clients. While the respondent had previously represented Ms. Auvil on several occasions, he was not her attorney at the time of the visit. On the date of the visit with inmate Auvil, the respondent was employed as the Director of the West Virginia Office of Consumer Advocacy and was not engaged in the private practice of law. While the respondent did not represent Ms. Auvil in a specific matter in 2005, he continued to give her advice of a legal nature.

The respondent admitted, and the Panel found, that he and Ms. Auvil began a sexual relationship in 1986. At times in this relationship Ms. Auvil received monetary renumeration in exchange for sexual activities with the respondent. The respondent admitted to previously visiting with Ms. Auvil in other correctional and regional jail facilities, including Lakin Correctional Center. The respondent admitted to sending money to Ms. Auvil in the past. The Panel further found that four days prior to the visit that gives rise to these proceedings, the respondent had sent to Ms. Auvil a $30 money order. This money order was sent in an

---

1. West Virginia Rules of Professional Conduct, Rule 8.4 states:

It is professional misconduct for a lawyer to:

. . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

and

. . .

(d) engage in conduct that is prejudicial to the administration of justice.

envelope bearing the name of the respondent's former law firm but with an assumed name on the document itself. The respondent acknowledges that he sent this money order to Ms. Auvil, but denies that this money order constituted payment for future sexual activities.

On October 11, 2005, the respondent called PCC at about 1:20 p.m. to schedule an attorney-inmate visit with Ms. Auvil. The respondent testified that he was given permission for this visit and then traveled from Fairmont to Grafton. While at the administration building, the respondent informed the prison authorities that he represented[2] Auvil and provided his West Virginia State Bar membership card and state driver's license as proof of his identity. He also listed himself as "attorney" on the sign-in sheet at the facility. The respondent was then escorted to a multi-purpose room where Ms. Auvil was brought to him within 10 minutes.

The respondent and Ms. Auvil were alone in the room. The respondent testified before the Panel that he and Ms. Auvil discussed the disposition and location of her personal belongings and automobile since her incarceration. He stated that this was a very short conversation. The respondent testified that as he started to leave, Ms. Auvil asked him to wait and stated how appreciative she was of his efforts on her behalf. The respondent then testified that Ms. Auvil then initiated sexual contact with him by inquiring if he would like to receive oral sex. She then reached for the zipper fastening his trousers. The respondent testified that the zipper stuck and Ms. Auvil was unable to continue unzipping his pants. The respondent then unzipped his pants for Ms. Auvil. The parties stipulated that as Ms. Auvil was engaged in an act of oral sex upon the respondent, they were interrupted by a corrections officer who had been monitoring the visitation.

Ms. Auvil was removed from the visitation area. The parties agree that as the respondent was attempting to leave PCC, he was asked by the warden of the facility to remain to speak to law enforcement.[3]

The Panel concluded that:

Respondent's conduct involved deceit, dishonesty, and misrepresentations to the officers at PCC to gain access to Ms. Auvil for an improper purpose and the same reflects adversely on his character and fitness to practice law and is in violation of Rules 8.4(c) and 8.4(d) of the Rules of Professional Conduct.

The Panel also found that on at least one other occasion, while not actually representing Ms. Auvil, Mr. Stanton arranged for an attorney-client visit with her. This was while Ms. Auvil was incarcerated in Mason County, West Virginia, at Lakin Correctional Facility. By letter dated August 9, 2005, Mr. Stanton represented to prison authorities his need to arrange a meeting with his client, Ms. Auvil. As has been previously detailed, the respondent's representation of Ms. Auvil ceased in 2003, and at the time of the August 9, 2005, request, Mr. Stanton was in the employ of the State of West Virginia in Charleston, West Virginia.

The Panel found:

Although engaging in sexual contact at a prison facility is completely inappropriate and in violation of the facility's rules, the core of his misconduct is Respondents's (sic) dishonest and deceit conduct towards (sic) the correctional facility officers to gain access to an inmate for an improper purpose. This conduct clearly demonstrates an appalling lack of judgment, discretion and concern for his own personal integrity and calls in to question his fitness as a member of the Bar.

**2.** While the facts are undisputed for the purposes of this appeal, the issue of whether the respondent claimed to be prisoner Auvil's attorney to gain access to the prisoner was initially a point of contention. Prior to the hearing before the Panel, the respondent asserted that he advised the prison authorities that he was an attorney but stated he did not specifically advise them that he represented her. At the hearing before the Panel, however, the respondent agreed that he intentionally led the officers at PCC to believe he was Auvil's attorney and that the visit was related to his representation of her.

**3.** The respondent did give a voluntary statement to law enforcement who investigated this incident for possible criminal activity. The respondent has not been subject to criminal prosecution for his actions.

The ODC filed its proposed findings of fact, conclusions of law and recommended sanctions on February 9, 2009. In its proposal, the ODC recommended that respondent Stanton's license to practice law be suspended for one year, that he take additional continuing legal education in the area of ethics and that he reimburse the ODC for the costs of this proceeding. The respondent did not file proposed findings of fact and conclusions of law.

The Board adopted without change the findings of fact and conclusions of law proposed by the ODC. The Board's recommendation, however, differed from that proposed by the ODC. In its report to the Court, the Board recommended that the respondent be admonished for his conduct; that he complete an additional six hours of CLE in the area of ethics in addition to the existing requirements for the 2008–2010 reporting period; and that Mr. Stanton bear the costs of this proceedings.

Mr. Stanton did not challenge the findings of fact, conclusions of law or the recommendation of the Board. He requested that this Court impose those sanctions. On June 17, 2009, we rejected the recommended sanctions and ordered that the parties file briefs in this Court.

## II.

### STANDARD OF REVIEW

■ In lawyer disciplinary proceedings, this Court accords *de novo* review to the recommended decision of the Lawyer Disciplinary Board's Hearing Panel Subcommittee:

A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, proba-

tive, and substantial evidence on the whole record.

Syl. pt. 3, *Committee on Legal Ethics of The West Virginia State Bar v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994). Nevertheless, "[a]bsent a showing of some mistake of law or arbitrary assessment of the facts, recommendations made by the State Bar Legal Ethics Committee . . . are to be given substantial consideration." Syl. pt. 3, in part, *In re Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980).

■ This Court is responsible for determining the ultimate resolution of lawyer disciplinary proceedings. As such, "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Committee on Legal Ethics of The West Virginia State Bar v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984). The appropriate sanction is likewise the responsibility of this Court, with three distinct goals in mind: punishment, deterrence and maintaining the public's trust and confidence in the lawyers that serve this State.

In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

Syl. pt. 3, *Committee on Legal Ethics of The West Virginia State Bar v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987). When determining the particular sanction for a lawyer's misconduct, this Court is guided by a list of considerations supplied by the rules governing lawyer discipline.

In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court or Board shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly,

or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.

W. Va. Rules of Lawyer Disciplinary Procedure Rule 3.16.

With these standards in mind, we now proceed to consider the Panel's recommended decision and the parties' contentions.

## III.

### DISCUSSION

■ At first glance, this case appears to relate solely to the prurient acts of an attorney with a woman with whom he had a long-standing sexual relationship. From a legal disciplinary standpoint, however, this case is of greater moment. Without undue focus on the case's salacious details, this case distills down to the deliberate misrepresentations of a member of the State Bar to correctional officers of a secure prison facility in order to gain access to an incarcerated person in the State's custody, the subsequent abuse of trust occasioned by the attorney's taking advantage of the inmate and whether that conduct is a violation of our Rules of Professional Conduct.

In terms of available sanctions, if appropriate, we must analyze the impact of Mr. Stanton's actions on the public, the legal system, the profession and Ms. Auvil. While we give substantial deference to the findings of the Panel and respectful consideration to the Board's recommendations, we ultimately must exercise our own independent judgement in the disposition of this matter. In first considering whether the respondent did in fact violate the Rules of Professional Conduct, we begin by reviewing the adjudicatory record made before the Board *de novo*.

We believe that the record before us fully supports the Panel's determination and conclusion that the respondent did in fact violate Rule 8.4(c) and 8.4(d) by misrepresenting the nature of his visit to Rose Auvil on October 11, 2005. At the time of this incident, Mr. Stanton did not represent Ms. Auvil. None-theless, with deliberation and forethought, the respondent made arrangements to visit Ms. Auvil while she was incarcerated at PCC. The first misrepresentation occurred when he telephoned the officials at PCC to arrange a same-day visit with Ms. Auvil. The misrepresentation continued when he drove from Fairmont to Grafton and presented himself to the administration as Ms. Auvil's attorney. In order to gain access to the secured facility, the respondent had to present his proof of identity, as well as membership in the West Virginia State Bar through use of a bar identification card. Without hesitation we agree with the Panel's findings and conclusion that this conduct was in fact professional misconduct, in that Mr. Stanton engaged in dishonesty by holding himself out to be Ms. Auvil's attorney in order to gain access to her while she was incarcerated and in state custody. But for such misrepresentation as to the nature of his visit, Mr. Stanton would not have been able to see Ms. Auvil, except perhaps on a regularly scheduled visitation day.[4]

It is especially troubling to this Court that Mr. Stanton's actions have been prejudicial to the administration of justice, in violation of Rule 8.4(d). Incarcerated individuals rely upon a good working relationship between jail and/or prison authorities and members of the bar to ensure that attorneys and clients may easily and conveniently confer on matters. Jail or prison officials should not have to over-analyze the motivations of an attorney who seeks to meet with an incarcerated individual whom he states or implies is his client. Mutual trust and understanding is required so that the mandates of representation may be achieved.

Having established that the conduct of the respondent did violate the aforementioned rules, we must now determine the appropriate sanction. While this court gives respectful consideration to the Board's recommendations, the sanction must ultimately be established and determined by this Court.

■ We are guided in this regard by Rule 3.16 of the Rules of Professional Conduct.

---

**4.** According to the PCC rules, each inmate must list the name of persons with whom he or she would like to visit. The respondent's name was not on the list of requested visitors.

Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: " 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [Supreme Court of Appeals of West Virginia] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.' " Syl. pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan,* 204 W.Va. 495, 513 S.E.2d 722 (1998).

The first step in our review of the sanction to be imposed upon the respondent for violations of our rules is to consider whether the respondent violated a duty owed to a client, to the public, to the legal system or to the profession. As noted, at the time of the incident that led to the institution of these proceedings, Mr. Stanton did not formally represent Ms. Auvil. His last representation of her was in 2003. After 2003, the terms of his respective employment precluded such formal representation. As such, any duty owed was not to the client but to the public, legal system or the profession.

In its report to this Court, the Panel noted that:

> [T]he public expects lawyers to exhibit the highest standards [of] integrity and honesty. Lawyers have a duty not to engage in conduct involving dishonesty, fraud, or interference with the administration of justice. Lawyers are officers of the court and must operate within the bounds of the law and act in a manner to maintain the integrity of the Bar. Respondent's admitted conduct in this matter falls woefully short of all of these stated obligations that a lawyer owes to the public and the profession.

We agree.

We next consider whether Mr. Stanton acted intentionally, knowingly or negligently.

The respondent's conduct was, by his own admission, both a knowing and an intentional act. From the initial decision to contact PCC to arrange for the visit with the incarcerated Ms. Auvil, to the drive from Fairmont to Grafton, to the misrepresentation of his status as Ms. Auvil's attorney, to the decision to engage in inappropriate sexual contact with Ms. Auvil, and so on, Mr. Stanton acted deliberately and of his own volition. Thus, the Panel correctly concluded that Mr. Stanton acted intentionally and knowingly.

The next determination in our review is the amount of actual or potential injury caused by the lawyer's misconduct. The Panel concluded that the "amount of potential injury to the reputation and integrity of the profession was great." There was no finding, however, of actual legal injury to any member of the general public. With respect to harm to the legal profession, we agree with the Panel's analysis and recommendation. We disagree, however, with respect to the Panel's conclusion as to harm to a member of the public. While Ms. Auvil may not have been a formal client at the time of this incident, she was an incarcerated person in the custody of the State. Respondent's actions toward Ms. Auvil were inexcusable.

The fourth and final factor in our analysis is the existence of any aggravating or mitigating factors. We have previously held that "[m]itigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syllabus Point 2, *Lawyer Disciplinary Bd. v. Scott,* 213 W.Va. 209, 579 S.E.2d 550 (2003). We explained:

> Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in

the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

Syllabus Point 3, *Scott, supra.*

The Panel found the existence of three mitigating factors. The first factor in mitigation was Mr. Stanton's full and free disclosure of his misconduct to the Office of Disciplinary Counsel. The second factor was the respondent's absence of a prior disciplinary record. The third factor was the respondent's obvious remorse. We believe the record of this proceeding shows that all three factors should be considered in mitigation of Mr. Stanton's conduct. The aggravating factors noted by the Panel were the respondent's experience in the practice of law, his selfish motive, a pattern of making false representations to correctional facilities to gain access to Ms. Auvil and the vulnerability of Ms. Auvil.

This type of behavior has never been before the Court in this manner. This Court has found no authority from other jurisdictions based upon the particular facts alleged herein. While at one time sexual relations between an attorney and a client was not a direct violation of the Rules of Professional Conduct, since 1995 our rules have addressed these types of relationships.[5] As such this appears to be a case of first impression in crafting the appropriate discipline, we must look to other cases involving deceitful and dishonest conduct in violation of Rules 8.4(c) and 8.4(d), but not involving theft, commingling or misappropriation of client funds. In previous cases an attorney's law license was suspended 60 days for altering a signed court order[6]. Altering a document after it was

issued by the circuit and then serving it upon an individual warranted a reprimand.[7]

More recently in *Lawyer Disciplinary Board v. Markins,* 222 W.Va. 160, 663 S.E.2d 614 (2008), an attorney received a two-year suspension for repeated unauthorized access of another firm's e-mail accounts. This discipline was predicated in part upon violations of Rule 8.4(c). This Court recognized the serious consequences that followed the unauthorized e-mail access, including the potential for harm to the law firm's ability to attract and maintain new clients, in ordering the attorney's suspension. In *Markins,* we specifically considered the serious nature of the potential for harm caused by an attorney's unethical conduct. Such a potential, as here, was clearly evident to the attorney, yet the attorney knowingly proceeded with his misconduct.

We are ever mindful of the mitigating factors that weigh heavily upon this Court's crafting of an appropriate sanction. However, the aggravating factors far outweigh the mitigating factors. We are cognizant of our role in protecting the public at large as well as the legal profession. "Disbarment of an attorney to practice law is not used solely to punish the attorney but is for the protection of the public and the profession." Syl. pt. 2, *In re Daniel,* 153 W.Va. 839, 173 S.E.2d 153 (1970).

Mr. Stanton's conduct as an attorney in misrepresenting himself as counsel for Ms. Auvil in order to gain access to her for improper reasons was more than mere deceit. His conduct fell so far below what should reasonably be expected of attorneys as to be shocking to this Court. His actions fueled a wave of questions by the public, the incarcerated, jail authorities and fellow members of the legal profession. This Court is

**5.** Rule 8.4(g) of the Rules of Professional Conduct states:

It is professional misconduct for a lawyer to:
. . .
(g) have sexual relations with a client whom the lawyer personally represents during the legal representation unless a consensual sexual relationship existed between them at the commencement of the lawyer/client relationship. For purposes of this rule, "sexual relations" means sexual intercourse or any touching of

the sexual or other intimate parts of a client or causing such client to touch the sexual or other intimate parts of the lawyer for the purpose of arousing or gratifying the sexual desire of either party or as a means of abuse.

**6.** *Lawyer Disciplinary Board v. Ansell,* 210 W.Va. 139, 556 S.E.2d 106 (2001).

**7.** *Lawyer Disciplinary Board v. Losch,* 219 W.Va. 316, 633 S.E.2d 261 (2006).

faced with having to reassure all affected parties that the likelihood of this conduct, and similar conduct by other members of the bar, is going to be met with harsh consequences. Furthermore, this Court must assist in protecting the vulnerable, especially those in State custody, from the lustful advances of attorneys as well as maintaining the good relationship between the criminal bar and the state's jail and prison authorities. The recommended disposition of the Board does not accomplish these goals. Accepting any sanction other than disbarment does not send a clear and resounding message to the bar, the public and other interested parties, including jail and prison authorities who must work with attorneys on a daily basis.

## IV.

### CONCLUSION

For the foregoing reasons, we conclude that the conduct of the Respondent, G. Patrick Stanton, Jr., was unethical and constituted a violation of the West Virginia Rules of Professional Conduct. This Court accepts the Board's findings of fact and conclusions of law that the Respondent violated Rules 8.4(c) and 8.4(d) of the West Virginia Rules of Professional Conduct. This Court accepts the recommendation of the Panel in regard to the Respondent's responsibility for reimbursing the ODC for the costs of this proceeding. The Court rejects, however, the recommendation of the Panel that the Respondent simply be admonished for his conduct with Ms. Auvil, and we further reject the ODC's suggestion that the respondent be suspended from the practice of law for a period of one year. In order to maintain the requisite level of conduct required of licensed attorneys in West Virginia, this Court orders the annulment of G. Patrick Stanton, Jr.'s license to practice law in the State of West Virginia. The mandate of the Court shall issue forthwith.

**License to practice law annulled.**